OPINION.
{¶ 1} Defendant-appellant Joseph Elliott appeals the judgment of the Hamilton County Common Pleas Court rejecting his postconviction application for deoxyribonucleic acid (DNA) testing of rape-kit swabs collected in connection with his prosecution and conviction for rape and aggravated burglary. Because DNA-test results excluding Elliot as the source of the biological material would be outcome-determinative, we hold that the trial court abused its discretion when it rejected his application.
 {¶ 2} In 1996, a Hamilton County jury returned guilty verdicts against Elliott on two counts of rape and two counts of aggravated burglary. The trial court sentenced him to four indefinite prison terms of eight to twenty-five years, with the sentence for aggravated burglary in count three of the indictment to run consecutively to the sentences for the two concurrent rape counts. We affirmed the judgment of conviction in December of 1996, see State v. Elliott (Dec. 24, 1996), 1st Dist. No. C-960072, and the Ohio Supreme Court denied Elliott leave to file a delayed appeal. See State v. Elliott (1999),87 Ohio St.3d 1442, 719 N.E.2d 5.
 {¶ 3} In March of 1997, Elliot secured the release of the victim's nightshirt for DNA analysis of a bloodstain that it bore. The DNA analysis excluded Elliott as the source of the blood. Based on this new evidence, Elliott sought a new trial by means of a Crim.R. 33 motion and an R.C. 2953.21 postconviction petition. These efforts proved fruitless. See State v. Elliott,
1st Dist. No. C-010598, 2002-Ohio-4454; State v. Elliott, 1st Dist. No. C-020736, 2003-Ohio-4962.
 {¶ 4} In September of 2004, Elliott applied under R.C.2953.71 et seq. for DNA analysis of vaginal, oral, and rectal swabs collected from the victim during her rape-kit examination at University Hospital. Subsequently, the Ohio Innocence Project entered its appearance as counsel for Elliott. Following a hearing, the common pleas court denied Elliott's application. This appeal followed.
 I. {¶ 5} In his first assignment of error, Elliott asserts that the common pleas court abused its discretion when it rejected his application. Specifically, he argues that the court wrongly concluded that DNA-test results excluding him as the source of any biological material on the rape-kit swabs would not be outcome-determinative. We agree.
 A. Y-Chromosome Short Tandem Repeat ("Y-STR") DNA Analysis {¶ 6} DNA testing has become a forensic tool by which technology can increase the public's confidence in the judicial system. "Humans are 99.9% identical[;] therefore DNA is extremely similar as between humans, but variations do exist among the several different genetic loci along a chromosome. In all, `two unrelated individuals will differ at about one site in a thousand.' As a result, every human genotype — an individual's genetic makeup — will not have DNA identical to another, except in the case of identical twins. The variations consist of differing lengths of DNA fragments at particular loci. The chances of individuals possessing the same DNA fragment lengths at a given locus are small but not impossible. Forensic scientists calculate the probability of an innocent person possessing a match to the DNA profile generated from biological evidence at a crime scene to range from one in millions to one in many billions. Such statistical evidence explains the power of DNA tests and courts' increasing dependence upon them." Schaffter, Postconviction DNA Evidence: A 500 Pound Gorilla in State Courts (2002), 50 Drake L.Rev. 695, 699-700 (footnotes omitted).
 {¶ 7} "The Y Chromosome is the DNA in the nucleus of a cell that is present only in males." C.J. Word, The Future of DNA Testing and Law Enforcement (2001), Speech at the Brooklyn Law School Symposium on DNA: Lessons From the Past — Problems For the Future, in 67 Brooklyn L.Rev. (Fall 2001), 249, 251, fn. 5. In 1995, the best available DNA test was unable to detect a male DNA profile on a swab taken from a rape victim if no sperm was visible when the swab was examined microscopically. See P. de Mazancourt, Y-STR as Proof of Rape When Sperm Cells Cannot be Found (2002), Address Before the 13th International Symposium on Human Identification. Current Y-Chromosome Short Tandem Repeat ("Y-STR") analysis now allows the development of DNA profiles where no sperm is detectable microscopically. U.S. Department of Justice (July 2002), Using DNA to Solve Cold Cases, at 5.
 B. DNA Testing Under R.C. 2953.71 et seq. {¶ 8} The advances in DNA testing prompted the General Assembly in 2003 to enact R.C. 2953.71 et seq. The statutes permit an eligible prison inmate who has been convicted of a felony and who has at least a year remaining on his prison term to file with the common pleas court a postconviction application for DNA testing of biological evidence upon which no DNA test, or an inconclusive DNA test, has been conducted. See R.C.2953.71(F), 2953.72(A) and (C), 2953.73(A), and 2953.74(A) and (B). The court may "accept" an eligible inmate's DNA-testing application only if (1) biological material was collected from the crime scene or the victim, and the parent sample of that biological material still exists; (2) the parent sample of the biological material is sufficient, demonstrably uncorrupted, and scientifically suitable for testing; (3) the identity of the perpetrator of the charged offense was an issue at the inmate's trial; (4) a defense theory at trial was such that it would permit a conclusion that an "exclusion result w[ould] be outcome determinative"; and (5) "if DNA testing is conducted and an exclusion result is obtained, the results of the testing w[ould] be outcome determinative." See R.C. 2953.74(B) and (C).
 {¶ 9} An "exclusion result" is a DNA-test result "that scientifically precludes or forecloses the * * * inmate as a contributor of biological material recovered from the crime scene or victim." R.C. 2953.71(G). An exclusion result is "outcome determinative" if, "had the result been presented at the [inmate's] trial * * * and been found relevant and admissible * * *, no reasonable factfinder would have found the inmate guilty of [the] offense." R.C. 2953.71(L).
 {¶ 10} R.C. 2953.74(A) provides that the common pleas court "has discretion on a case-by-case basis" to accept or reject an eligible inmate's application for DNA testing. Despite the plain language of the statute, some appellate districts have reviewed de novo the decision to accept or reject an application for DNA testing. See, e.g., State v. Wilkins, 163 Ohio App.3d 576, 2005-Ohio 5193, 839 N.E.2d 457, at ¶ 6; State v. Lemke, 7th Dist. No. 05 CB 42, 2006-Ohio-3481, at ¶ 11; State v. Rossiter,
9th Dist. No. 03CA0078, 2004-Ohio-4727, at ¶ 5. But we must take the General Assembly at its word. We, therefore, review the court's decision for an abuse of discretion.
 {¶ 11} An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. See State v. Hill (1967),12 Ohio St.2d 88, 232 N.E.2d 394, paragraph two of the syllabus. In applying the standard, a reviewing court "is not free to substitute its judgment for that of the trial judge." Berk v.Matthews (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301. And it may not disturb the lower court's judgment if it appears that the court, in the exercise of its discretion, exhibited a sound reasoning process that supports its decision. See AAAAEnterprises, Inc. v. River Place Community Urban RedevelopmentCorp., 50 Ohio St.3d 157, 161, 553 N.E.2d 597; see, also,Bowden v. Annenberg, 1st Dist. No. C-040499, 2005-Ohio-6515, at ¶ 49.
 C. Elliott's Application for DNA testing {¶ 12} In this case, the victim was sexually assaulted by an intruder in her home. She could not identify the intruder, except to describe his race, height, weight, and the clothing he was wearing. But a partial fingerprint on a wine bottle found on the floor of the victim's bedroom and two prints on the outside frame of a sliding-glass balcony door led the state to charge Elliott with rape and aggravated burglary.
 {¶ 13} At trial, the victim testified that the intruder had vaginally and orally raped her. She stated that "[i]t had been a while * * * more than a couple of days" since she had last had sex with her husband, and that she did not think her assailant had ejaculated. Nevertheless, the doctor who conducted the victim's rape-kit examination found semen in the victim's vaginal chamber. The doctor testified at trial that sperm could remain in the vaginal chamber for several days, but that motile sperm would die within a few hours.
 {¶ 14} In the course of the victim's rape-kit examination, the doctor took several vaginal, oral, and rectal swabs. His microscopic examination of one of the vaginal swabs showed nonmotile sperm. Following standard procedure, he discarded that swab and the microscope slide, and he packaged the remaining swabs for the Hamilton County Coroner's Office. A serologist with the coroner's office conducted visual, chemical, and microscopic analyses of the remaining swabs and found no semen.
 {¶ 15} In support of his application for DNA testing of the swabs collected from the victim, Elliott asserted that Y-STR DNA testing was not available at the time of his prosecution, that Y-STR analysis could detect and identify male DNA when a microscopic exam would not, and that Y-STR results that excluded him as the source of male DNA found on the swabs would be outcome-determinative.
 {¶ 16} In its memorandum in opposition to Elliott's application for Y-STR DNA testing and at the hearing on his application, the state did not challenge the existence, quantity, or quality of the biological material sought to be tested. It argued only that an exclusion result would not be outcome-determinative.
 {¶ 17} The common pleas court found Elliott eligible to apply for DNA testing under R.C. 2953.71 et seq. But it rejected his application after concluding that "nothing in the record * * * indicate[d] that DNA exclusion of [Elliott] would be outcome determinative."[1] In so concluding, the court noted that non-DNA analyses of the swabs had not implicated Elliott in the rapes, and that the jury had nevertheless found him guilty. Thus, the court reasoned, a DNA-test result that excluded Elliott as the source of this material, or that pointed to someone else, would not alter the evidence upon which he had been convicted.
 {¶ 18} In reviewing the court's rejection of Elliott's application for an abuse of discretion, we are guided by the criteria set forth in R.C. 2953.74(B) and (C). In the proceedings below, the state did not challenge, and the court did not question, the existence, quantity, or quality of the biological material sought to be tested. See R.C. 2953.74(C)(1), (2), and (6). Elliott contested at trial his identity as the victim's assailant by advancing the alibi that he had been at work when the crimes were committed. See R.C. 2953.74(C)(3). And his alibi defense must be said to permit a conclusion that an exclusion result would be outcome-determinative. See R.C. 2953.74(C)(4).
 {¶ 19} Thus, the common pleas court's rejection of Elliott's application for DNA testing stands or falls with its determination that DNA-test results excluding Elliott as the source of biological material on the swabs would not be outcome-determinative. Our review of the record compels us to conclude that the court, in rejecting the application on this basis, abused its discretion.
 {¶ 20} The victim testified at trial that she did not think that her rapist had ejaculated. But the doctor who performed the victim's rape-kit examination found sperm in her vaginal chamber. The doctor testified that sperm could remain in the vaginal chamber for several days. But the victim testified that "[i]t had been a while * * * more than a couple of days" since she and her husband had had sex.
 {¶ 21} This testimony distinguishes Elliott's case fromState v. Wilkins, 163 Ohio App.3d 576, 2005-Ohio 5193,839 N.E.2d 457. In Wilkins, the Ninth Appellate District concluded that a DNA-test result excluding Wilkins as the source of sperm on a cervical swab would not have been outcome-determinative because, on the record there, the victim's boyfriend could not be eliminated as a source of the sperm.
 {¶ 22} In contrast, the evidence adduced at Elliott's trial effectively eliminated the victim's husband as the source of any male DNA in her vaginal chamber. And it did not allow for any source of such DNA but the victim's rapist. Thus, the source of any male DNA on the rape-kit swabs could only have been the rapist.[2] It follows that a YS-TR test result that excludes Elliott as the source of male DNA on the swabs would necessarily exclude him as the victim's rapist. Accordingly, we conclude that an exclusion result would be outcome-determinative.
 {¶ 23} Pursuing this line of reasoning, we further conclude that an exclusion result that would be outcome-determinative of the rapes would likewise be outcome-determinative of the aggravated burglaries. The jury found Elliott guilty of two counts of aggravated burglary. One count charged that he had trespassed at a time when someone was present or likely to be present; the other count charged that he had done so with a deadly weapon or dangerous ordnance. And both counts charged that he had acted with a purpose to commit either a theft offense or a felony.
 {¶ 24} The victim testified at trial that when she returned to her home after her assault, she found several small personal items missing. Thus, either the rapes or a theft offense could have served as the underlying offenses to the aggravated-burglary charges.
 {¶ 25} But the evidence presented at trial did not suggest the presence of more than one intruder. Thus, the perpetrator of the rapes must necessarily have been the perpetrator of the burglaries. It follows that, regardless of whether the rapes or a theft offense provide the offenses underlying the aggravated burglaries, Y-STR test results that exclude Elliott as the victim's rapist would effectively exclude him as the burglar.
 {¶ 26} The record before us thus leads inexorably to the conclusion that Y-STR testing that excludes Elliott as the source of male DNA found on the rape-kit swabs would be outcome-determinative of the rape and aggravated-burglary charges. Therefore, we hold that the common pleas court abused its discretion when it rejected Elliott's application for DNA testing. Accordingly, we sustain the first assignment of error.
 II. {¶ 27} In his second assignment of error, Elliott contends that the common pleas court erred in rejecting his application for DNA testing because the state and federal constitutional guarantees of due process require a state to provide a criminal accused with exculpatory evidence. Our conclusion under the first assignment of error, that the court abused its discretion in rejecting the application, renders moot the challenge advanced in his second assignment of error. We, therefore, do not reach the merits of this challenge.
 {¶ 28} Having thus determined that the common pleas court abused its discretion when it rejected Elliott's application for DNA testing, we reverse the court's judgment and remand the case for further proceedings consistent with law and this Opinion.
Judgment reversed and cause remanded.
Hildebrandt, P.J., and Painter, J., concur.
[1] We note that the common pleas court's entry denying the application did not satisfy the statutory requirement that the court "include within the judgment and order * * * the reasons for * * * rejection" of the application. See R.C. 2953.73(D); see, also, State v. Thomas, 1st Dist. No. C-050245,2006-Ohio-962. But we are not constrained in our review of the judgment, because the court also placed of record its post-hearing letter to the parties, in which it had memorialized its conclusion that an exclusion result would not be outcome-determinative.
[2] Moreover, as Elliott points out, if Y-STR testing excludes Elliott as the DNA's source, the victim's husband, although now deceased, could also be excluded as a source by profiling a Y-chromosome provided by one of the couple's sons.